UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

   v.                                   Case No. 23-cr-98

OTANIYEN IDUOZEE,

          Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Rebecca Taibleson and Carter Stewart, Assistant United States Attorneys, and the defendant, Otaniyen Iduozee, individually and by attorney Aneeq Ahmad, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in one count of a five-count indictment with a violation of Title 18, United States Code, Section 1956(h).

3.     The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## BACKGROUND ALLEGATIONS

*At times relevant to this indictment:*

### Relevant Persons

1. *JOHN UMUKORO is a Nigerian citizen who was present in the United States on a student visa and residing in Michigan.*

2. *SHEDRACK UMUKORO is a Nigerian citizen who was residing in England.*

3. *JOHN and SHEDRACK UMUKORO are brothers.*

4. *OTANIYEN IDUOZEE is a Nigerian citizen who was present in the United States on a student visa.*

5. *E.S. is a woman and American citizen residing in New Berlin, Wisconsin.*

6. *C.C. is a woman and American citizen residing in Canton, Georgia.*

### The Romance Scam and Relevant Terms

7. *The defendants participated in an extensive scheme to fraudulently obtain and then launder money from American citizens who believed they were sending funds to their romantic partners. At its core, the scheme involved tricking victims into sending money to various accounts controlled and accessed by the defendants and other co-actors, and then transferring those funds, often through layered transactions, to conceal the funds' fraudulent origin and to move the funds to other countries.*

8. *A "romance scam" is a type of fraudulent conduct in which a perpetrator feigns romantic intentions towards a victim. The perpetrator, using a fraudulent or stolen identity, frequently meets the victim through an online dating website or application. The perpetrator spends weeks or months cultivating a romantic relationship with the targeted victim through online messaging, emails, text messaging, or voice calls, to gain his or her affection and trust. Once the perpetrator gains the victim's affection, the perpetrator begins to tell the victim about*

2

urgent financial needs, such as a business opportunity, a tax debt, or a family illness, and pressures the victim to provide financial assistance, often with the promise of repayment.

9.      Perpetrators often turn romance scam victims into "money mules," by tricking the victims into relaying other victims' money through interstate wire transfers to bank accounts controlled by the perpetrators or their co-conspirators. A "money mule" is an individual who transfers or moves illegally acquired money on behalf of someone else. Money mules add layers of distance between crime victims and criminals, which makes it harder for law enforcement to accurately trace money trails.

10.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Bitcoin is a prominent cryptocurrency. Cryptocurrency can exist digitally on the Internet, on an electronic storage device, or on cloud-based servers. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.

11.     Gemini, Coinbase, and Remitano are all cryptocurrency exchanges. Remitano is based in the Seychelles, and also operates in Nigeria; it does not do business in the United States.

12.     Most cryptocurrencies have a blockchain, which is a distributed public ledger containing an immutable historical record of every transaction.

13.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and store public and private keys used to send and receive cryptocurrency.

* * *

Manner and Means

3

16. Members of the conspiracy developed fraudulent online profiles, posing as potential romantic partners, to meet victims online. One such profile was for a man named "Anthony Williams." "Williams" posed on online dating websites as a geologist who was working on an offshore oil-related project.

17. Posing as "Williams" or using similar fraudulent identities, the defendants established romantic relationships with victims who they met online. They gained the victims' trust through extensive communications, promises to visit, and delivery of gifts, most of which were facilitated through the use of interstate wires. They then convinced the victims to send money, which transfers were also accomplished through the use of interstate wires.

18. E.S. was a victim of the romance scam. In about November of 2021, E.S. met "Anthony Williams" on the online dating website OurTime, which is designed for people over 50 years old. After gaining E.S.'s trust, "Williams," under false and fraudulent pretenses, representations, and promises, directed E.S. to transfer money into accounts controlled by members of the criminal conspiracy. "Williams" sent E.S. fake contracts and promissory notes to substantiate his requests for money and to convince her that he would soon repay these "loans." Throughout the course of their correspondence, E.S. sent "Williams" over $1.5 million via cashier's checks, wire transfers, cryptocurrency transfers, and by purchasing GreenDot cards from Walmart, all pursuant to "Williams's" instructions.

19. C.C. was also a victim of the romance scam. C.C. similarly met "Williams" through an online dating website. After gaining C.C.'s trust, "Williams," under false and fraudulent pretenses, representations, and promises, directed C.C. to transfer money into accounts controlled by members of the criminal conspiracy. Throughout the course of their correspondence, C.C. sent "Williams" approximately $158,000.

20. The defendants and other co-conspirators quickly disbursed the victims' funds

4

*after receiving them. They never repaid the "loans," as promised.*

21.     *Eventually, E.S. ran out of money to send "Williams." Soon thereafter, E.S. received a message from a co-conspirator, posing as a man who worked with "Williams," informing E.S. that "Williams" committed suicide by drowning in the Gulf of Mexico.*

22.     *Similarly, when C.C. finally ran out of money to send "Williams," she received a message from a man who claimed to work with "Williams," informing C.C. that "Williams" committed suicide by drowning in the Gulf of Mexico.*

23.     *Defendants and their co-conspirators victimized numerous individuals through their romance scam, in addition to E.S. and C.C., wrongfully obtaining in excess of $1.5 million.*

\* \* \*

### COUNT FIVE
*(Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h))*

**THE GRAND JURY FURTHER CHARGES THAT:**

26.     *The allegations set forth above in paragraphs 1-13, and paragraphs 16-23, are hereby incorporated in support of the following charge as if set forth in full here.*

27.     *Beginning by at least December of 2021, and continuing through in or about April of 2022, in the State and Eastern District of Wisconsin and elsewhere,*

**JOHN UMUKORO, SHEDRACK UMUKORO, and OTANIYEN IDUOZEE**

*did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely:*

a.  *to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States*

5

*Code, Section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and*

b. *to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).*

Manner and Means

28.     *The victims of romance scams were instructed to send their money through various means, including by sending wire transfers and checks to accounts controlled by the defendants and to money mules, and by opening and funding cryptocurrency accounts.*

29.     *Members of the conspiracy used fraudulent passports to open bank accounts in fake names, which accounts received victim funds.*

30.     *Members of the conspiracy accessed and controlled cryptocurrency accounts into which victims sent their funds.*

31.     *Members of the conspiracy would promptly withdraw the funds sent by the victims*

6

*and engage in further transactions with those funds in order to conceal their fraudulent origin, including by layering transactions through money mules.*

*32. OTANIYEN IDUOZEE and others known and unknown to the Grand Jury accessed and controlled bank accounts in the names of "Mazi Gabby," "Robert Wudi," "Robert Collins," and others, at banks including Chase Bank and Wells Fargo, into which "Anthony Williams" instructed E.S. to send funds.*

*33. OTANIYEN IDUOZEE and others known and unknown to the Grand Jury withdrew victim funds from those bank accounts. OTANIYEN IDUOZEE repeatedly transmitted victim funds, via cashier's checks, to a company called Copart, which is a global provider of online vehicle auction and remarketing services to automotive resellers. Those victim funds were used to purchase vehicles on behalf of companies and entities based in Nigeria.*

*34. JOHN UMUKORO, SHEDRACK UMUKORO, and others known and unknown to the Grand Jury also maintained their own cryptocurrency accounts, based in the United States and other countries, into which they received victim funds. These accounts included, but were not limited to:*

> *a. SHEDRACK UMUKORO maintained Coinbase cryptocurrency wallets ending in hV1a and ffYP.*

> *b. JOHN UMUKORO maintained Remitano cryptocurrency wallets ending in VGFp, FLa6, 19tA, and Dbqj.*

Specific Examples—Laundering Through Fraudulent Bank Accounts

*35. Using a fraudulent Kenyan passport, OTANIYEN IDUOZEE opened a Chase Bank account in the name of "Robert Collins," ending in 9782.*

*36. On or about January 12, 2022, "Williams" instructed E.S. to send $51,000 to this account, and she did so.*

7

37. *IDUOZEE withdrew part of the victim's funds in cash to keep for himself. He withdrew the rest through cashier's checks to Copart, in order to purchase vehicles on behalf of companies and entities based in Nigeria.*

    a. *For example, on or about January 21, 2022, IDUOZEE obtained a cashier's check (ending 3774) for $10,000, payable to Copart. That money purchased a 2007 Mercedes Benz and a 2021 Honda for a company called Akash General Motors Ltd., which is based in Nigeria. Those vehicles were later exported to Nigeria.*

Specific Examples—Laundering Through Cryptocurrency Transactions

38. *At "Williams's" instruction, C.C. became a money mule for the conspiracy.*

39. *On or about January 24, 2022, E.S. sent C.C. a check for $78,200 at the direction of "Williams." C.C., also acting at "Williams's" direction, transferred the funds into a cryptocurrency wallet maintained by Gemini. Specifically, C.C. wired $77,500 into her Gemini account on January 31, 2022. While the Gemini cryptocurrency wallet was in C.C.'s name, it was controlled by at least JOHN UMUKORO.*

    a. *On or about February 4, 2022, JOHN UMUKORO then transferred E.S.'s funds from C.C.'s Gemini account to a cryptocurrency wallet ending in qn5a. From there, on or about the same day, JOHN UMUKORO and SHEDRACK UMUKORO caused the further transfer of 0.46835 Bitcoin (at the time valued at approximately $19,114) of E.S.'s money to a Coinbase wallet ending in hV1a, whose sole owner was SHEDRACK UMUKORO. Through the same cryptocurrency wallet ending in qn5a, on or about the same day, JOHN UMUKORO also caused the transfer of 0.9864 Bitcoin (at the time valued at approximately $40,998) of E.S.'s money to a Remitano wallet ending in VGFp, whose sole owner is JOHN UMUKORO.*

40.     Similarly, on or about February 4, 2022, E.S. sent C.C. a check for $71,690 at the direction of "Williams." C.C., also acting at "Williams's" direction, transferred the funds into a cryptocurrency wallet maintained by Gemini, which was in C.C.'s name but controlled by at least JOHN UMUKORO. Specifically, C.C. wired $72,000 into her Gemini account on February 7, 2022.

a.    On or about February 7, 2022, JOHN UMUKORO then transferred E.S.'s funds from C.C.'s Gemini account to a cryptocurrency wallet ending in qn5a. On or about the same day, and through the same cryptocurrency wallet ending in qn5a, JOHN UMUKORO then caused the further transfer of 1.422758 Bitcoin (at the time valued at approximately $62,295) of E.S.'s money to a Remitano wallet ending in FLa6, whose sole owner is JOHN UMUKORO.

41.     Similarly, on or about February 11, 2022, E.S. sent C.C. a check for $80,000. C.C., also acting at "Williams's" direction, transferred the funds into a cryptocurrency wallet maintained by Gemini, which was in C.C.'s name but controlled by at least JOHN UMUKORO. Specifically, C.C. wired $80,100 into her Gemini account on February 16, 2022.

a.    On or about February 16, 2022, JOHN UMUKORO then transferred E.S.'s funds from C.C.'s Gemini account to a cryptocurrency wallet ending in vaql. On or about the same day, JOHN UMUKORO then caused the further transfer from that wallet of 1.452997 Bitcoin (at the time valued at approximately $63,124) to a Remitano wallet ending in Dbqj, whose sole owner is JOHN UMUKORO.

42.     Similarly, on or about February 17, 2022, E.S. sent C.C. a check for $4,751. C.C., also acting at "Williams's" direction, transferred the funds into a cryptocurrency wallet maintained by Gemini, which was in C.C.'s name but controlled by at least JOHN UMUKORO. Specifically, C.C. wired $15,500 into her Gemini account on February 18, 2022.

9

a.   On or about February 28, 2022, JOHN UMUKORO then transferred E.S.'s funds from C.C.'s Gemini account to a cryptocurrency wallet ending in 736n.  On or about the same day, JOHN UMUKORO then caused the further transfer from that wallet of 0.252823 Bitcoin (at the time valued at approximately $10,914) to a Remitano wallet ending in 19tA, whose sole owner is JOHN UMUKORO.

43.     Similarly, on or about March 2, 2022, E.S. sent C.C. a check for $172,214 at the direction of "Williams."  C.C., also acting at "Williams's" direction, transferred the funds into a cryptocurrency wallet maintained by Gemini, which was in C.C.'s name but controlled by at least JOHN UMUKORO.  Specifically, C.C. wired $172,000 into her Gemini account on March 7, 2022.

a.   On or about March 8, 2022, JOHN UMUKORO then transferred E.S.'s funds from C.C.'s Gemini account to a cryptocurrency wallet ending in qn5a.  From there, on or about the same day, JOHN UMUKORO and SHEDRACK UMUKORO caused the further transfer of 1.032929 Bitcoin (at the time valued at approximately $47,037) of E.S.'s money to a Coinbase wallet ending in ffYP, whose sole owner was SHEDRACK UMUKORO.

All in violation of Title 18, United States Code, Section 1956(h).

5.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

a.   This case concerns a "romance scam," which is a fraud scheme—typically targeting elderly people—in which the perpetrator feigns romantic intentions towards a victim. The perpetrator, using a fraudulent or stolen identity, typically

10

meets the victim through an online dating website or application. The perpetrator spends weeks or months cultivating a romantic relationship with the victim through online messaging, emails, text messaging, or voice calls, to gain his or her affection and trust. Once the perpetrator gains the victim's affection, the perpetrator begins to tell the victim about urgent financial needs, such as a business opportunity, a tax debt, or a family illness, and pressures the victim to provide financial assistance, often with the promise of repayment.

b.  E.S., a woman in her mid-60s residing in New Berlin, Wisconsin, fell victim to a romance scam. In November of 2021, E.S. met a man who called himself "Anthony Williams" through the dating website OurTime, which is designed for people over 50. "Williams" told E.S. that he was a geophysicist and had contracted with Conoco Phillips to work on a project on an oil rig in the Gulf of Mexico. E.S. believed "Williams" was a real person, and their written communications were romantic in nature, and extensive. "Williams" sent E.S. flowers and promised to visit her, once even sending her a Priceline itinerary showing flights to Milwaukee. At one point, "Williams" sent E.S. a custom embroidered pillow with their pictures on it.

c.  Between approximately December 2021 to May 2022, "Williams" would constantly ask E.S. for money. He claimed the money was to pay taxes or fees to a foreign bank located in England in order to access his own money within the bank. He also asked for money to pay for equipment needed for the engineering project and for food. "Williams" sent E.S. fake documentation to support his requests. For example, he gave her log-in information and a website to visit to check his (supposed) foreign bank account, and the website at one point showed that his account contained $3.5 million. He sent her a document that purported to be a contract he had signed with Conoco Phillips detailing the specifics of his project, how much he was to be paid, and the time period he would be working in the Gulf of Mexico. "Williams" also e-mailed E.S. promissory notes indicating he would pay her money back in full.

d.  E.S. expressed hesitation and discomfort about sending "Williams" money, but she eventually did. "Williams" instructed E.S. to send money in various ways. Pursuant to those instructions, she made numerous wire transfers to various bank accounts, sent cashier's checks and regular checks, and even – with "Williams's" coaching – opened a cryptocurrency account with Gemini Trust Company to which she sent money. "Williams" accessed and controlled the cryptocurrency account. After E.S.'s banks began to suspect fraud due to the volume of transfers, "Williams" directed her to load money onto "Green Dot" cards from Walmart. Eventually, by May of 2022, E.S. had sent approximately $1,511,433 at "Williams's" direction, which was all the money or assets to which she had access.

e.  Shortly after E.S. became unable to send "Williams" more money, she received a message from someone who identified themselves as "Randell," a member of "Williams's" crew. Randell told E.S. that "Williams" had committed suicide, falling into the Gulf of Mexico. E.S. was suspicious of this text, as the sentence

11

structure and verbiage matched "Williams's" manner of texting. She reached out to law enforcement shortly thereafter.

f. Iduozee knew that the funds were the proceeds of fraud, although he was not aware of their specific source. In order to help conceal their location, Iduozee laundered E.S.'s funds by opening, accessing, or controlling numerous bank accounts to which E.S. sent her money. Specifically, "Williams" instructed E.S. to send money to numerous bank accounts in the names of Robert Collins, Mazi Gabby, Robert Wudi, Ethan Mazi, and other similar name combinations. These accounts were opened using fraudulent Kenyan passports, many of which use the same or quite similar photographs that bear a resemblance to Iduozee.

    i. In September of 2022, Customs and Border Protection intercepted a package containing a very similar fraudulent Kenyan passport. That package was intended for the Miami address that Iduozee had listed as his primary residence on immigration records.

g. For example, on or about January 12, 2022, "Williams" instructed E.S. to send $51,000 to Chase Bank account 787689782 with account holder Robert Collins. "Collins" then withdrew E.S.'s money in the form of cashier's checks made out to a company called Copart, which is a global provider of online vehicle auction and remarketing services to automotive resellers. The distinctive signature on the withdrawal slip for those Copart payments matches Iduozee's signature on his I-131 immigration form.

    i. Among those withdrawals of E.S.'s money, Iduozee obtained a cashier's check (ending 3774) for $10,000, payable to Copart. That money purchased a 2007 Mercedes Benz and a 2021 Honda for a company called Akash General Motors Ltd., which is based in Nigeria. Those vehicles were later exported to Nigeria.

    ii. Iduozee also withdrew some of E.S.'s funds in cash, to keep for himself.

h. Similarly, "Williams" directed E.S. to send money to a Chase Bank account in the name of "Robert Wudi," in December of 2021. Records from that account reflect that in August of 2022, the "Wudi" account paid "Robert Collins" $9,800, with a signature on the withdrawal slip very similar to Iduozee's signature on his immigration form.

i. Iduozee repeatedly transmitted victim funds, like E.S.'s, to Copart. Those funds were used to purchase vehicles on behalf of companies and entities based in Nigeria. Iduozee generally also kept a portion of victim funds for himself.

6. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

12

## PENALTIES

7.    The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: 20 years and $250,000. Each count also carries a mandatory special assessment of $100, and a maximum of 3 years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 28 of this agreement.

8.    The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.    The parties understand and agree that in order to sustain the charge of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), as set forth in indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, the conspiracy as charged existed, and

Second, the defendant knowingly became a member of the conspiracy with the intent to advance the conspiracy.

To prove the underlying offense of money laundering (concealment) in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government would have to prove each of the following elements beyond a reasonable doubt:

First, the defendant conducted or attempted to conduct a financial transaction;

Second, some or all of the property involved in the financial transaction was proceeds of Wire Fraud;

Third, the defendant knew that the property involved in the financial transaction represented proceeds of some form of unlawful activity; and

13

Fourth, the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity.

To prove the underlying offense of money laundering (concealment/international) in violation of 18 U.S.C. § 1956(a)(2)(B)(i), the government would have to prove each of the following elements beyond a reasonable doubt:

First, defendant transported, transmitted, transferred, or attempted to do so, a monetary instrument or funds;

Second, the transportation, transmission, or transfer was from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States;

Third, the monetary instrument or funds involved the proceeds of Wire Fraud;

Fourth, the defendant knew that the instrument or funds represent the proceeds of some form of unlawful activity; and

Fifth, the defendant knew that the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea,

14

the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

13.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

14.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

### Base Offense Level

15.     The parties acknowledge and understand that the government will recommend to the sentencing court that the applicable base offense level for the offense charged in the indictment is 8 under Sentencing Guidelines Manual § 2S1.1(a)(2).

16.     If the sentencing court determines that the defendant does not have any criminal history points, and otherwise meets all of the criteria listed in Sentencing Guidelines Manual § 4C1.1(a), then the government will agree to recommend to the sentencing court that a 2-level decrease is applicable pursuant to § 4C1.1(a) of the Sentencing Guidelines.

15

### Specific Offense Characteristics

17.     The parties acknowledge and understand that the government will recommend to the sentencing court that the following adjustments are applicable to the offense level: An 18-level increase for loss greater than $3,500,000 under Guidelines Manual § 2B1.1(b)(1)(J) and § 2S1.1(a)(2); and a 4-level increase because the defendant was in the business of laundering funds under Guidelines Manual § 2S1.1(b)(2)(C). The parties acknowledge and understand that the defendant will not join in these recommendations; specifically, the defendant disputes the loss amount and related adjustment.

### Role in the Offense

18.     Pursuant to Sentencing Guidelines Manual § 3B1.2, the parties agree to recommend to the sentencing court that a 2-level decrease be given for a mitigating role in the offense.

### Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

16

## Sentencing Recommendations

20.    Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.    Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.    The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23.    The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.    The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.    The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant further understands that any payment schedule imposed

by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26.     The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

## Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## Restitution

28.     The defendant agrees to pay restitution as ordered by the court to E.S. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

29.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand and agree that if the

18

defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be

19

entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.    The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33.    The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

<u>**Further Civil or Administrative Action**</u>

34.    The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including

20

any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## MISCELLANEOUS MATTERS

35.     The defendant knowingly and voluntarily agrees to be deported and removed from the United States following the completion of any term of imprisonment in this matter.

## GENERAL MATTERS

36.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

21

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

**ACKNOWLEDGMENTS**

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 11-13-2024

OTANIYEN IDUOZEE
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: Nov 13, 2024

ANEEQ AHMAD
Attorney for Defendant

For the United States of America:

Date: 11/26/2024

GREGORY J. HAANSTAD
United States Attorney

Date: 4/26/24

REBECCA TAIBLESON
Assistant United States Attorney

23